**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| MALIKIE INNOVATIONS LTD. and KEY PATENT INNOVATIONS LTD., | § § § | |
| Plaintiffs, | § | Civil Action No. 2:26-cv-876 |
| v. | § § § | |
| ARCADYAN TECHNOLOGY CORPORATION, | § | JURY TRIAL DEMANDED |
| Defendant. | § § § | |

**COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND**

Plaintiffs Malikie Innovations Ltd. ("Malikie") and Key Patent Innovations Ltd. ("KPI") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint for patent infringement and damages against Defendant Arcadyan Technology Corporation ("Arcadyan" or "Defendant") and, in support, allege the following:

**PARTIES**

1. Plaintiff Malikie is the successor-in-interest to a substantial patent portfolio created and procured over many years by Blackberry Ltd., formerly known as Research in Motion Ltd., and its predecessor, subsidiary, and affiliated companies (collectively, "Blackberry"). Malikie is an Irish entity duly organized and existing under the laws of Ireland. Malikie has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

2. Plaintiff KPI is the beneficiary of a trust pursuant to which Malikie owns, holds, and asserts the Asserted Patents (set forth below). KPI is an Irish entity duly organized and existing under the laws of Ireland. KPI has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

3. On information and belief, Defendant Arcadyan Technology Corporation, is a corporation duly organized and existing under the laws of Taiwan, with a principal place of business at No. 8, Sec. 2, Guangfu Rd., Hsinchu City 30071, Taiwan.

4. On information and belief, Arcadyan and/or its employees or officers direct and/or control the actions of its direct and indirect subsidiaries. On information and belief, Arcadyan and/or its employees or officers direct and/or control the actions of these entities by, for example, inducing and contributing to the actions complained of herein. Arcadyan and its affiliates are part of the same corporate structure and distribution chain for the making, importing, offering to sell, selling, and/or using of the accused devices in the United States, including in the State of Texas generally and this judicial district in particular.

5. Arcadyan and its affiliates share the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and accused product lines and products involving related technologies.

6. Arcadyan and its affiliates regularly contract with customers regarding products made for or on behalf of those customers.

7. Arcadyan and its affiliates operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged herein.

**PATENTS IN SUIT**

8. Malikie is the assignee of and owns all right and title to U.S. Patent Nos. 8,099,646 (the "'646 Patent"); 7,453,856 (the "'856 Patent"); 7,747,934 (the "'934 Patent"); and 10,034,260 (the "'260 Patent") (collectively, the "Asserted Patents").

9. Blackberry developed numerous innovative and diverse technologies, including groundbreaking inventions pertaining to mobile devices and related software and wireless

communications technology. Some of these groundbreaking inventions are described and claimed in certain of the Asserted Patents.

10. The ’646 Patent, entitled “Low-Density Parity-Check (LDPC) Code” was duly and lawfully issued on January 17, 2012. A true and correct copy of the ’646 Patent is attached hereto as Exhibit 1.

11. The ’856 Patent, entitled “Method, Apparatus, and Communications Interface for Sending and Receiving Data Blocks Associated With Different Multiple Access Techniques” was duly and lawfully issued on November 18, 2008. A true and correct copy of the ’856 Patent is attached hereto as Exhibit 2.

12. The ’934 Patent, entitled “Method for Selecting Low Density Parity Check (LDPC) Code Used for Encoding of Variable Length Data” was duly and lawfully issued on June 29, 2010. A true and correct copy of the ’934 Patent is attached hereto as Exhibit 3.

13. The ’260 Patent, entitled “Wireless Local Area Network Hotspot Registration Using Near Field Communications” was duly and lawfully issued on July 24, 2018. A true and correct copy of the ’260 Patent is attached hereto as Exhibit 4.

14. Malikie sent a letter by courier addressed to Arcadyan’s President, dated January 10, 2025, that identified the ’646 and ’856 Patents and exemplary products and services that Malikie believed infringed its patents. Malikie explained that its portfolio included numerous patents relating to the Wi-Fi 802.11 standards which Malikie was willing to license. Arcadyan responded on January 17, 2025 and requested that the parties enter a Non-Disclosure Agreement (NDA) to facilitate discussions. Malikie promptly agreed. The parties entered an NDA on July 25, 2025.

15. On June 2, 2025, Malikie provided Arcadyan with a FRAND licensing rate proposal and supporting rationale. Malikie also provided claim charts for certain standards essential patents for Arcadyan's review. Malikie indicated that it was making a formal offer to Arcadyan to license its SEP patents covering 802.11x standards at a FRAND rate. Malikie asked Arcadyan to confirm within sixty days whether it agreed to the offered rates, and that if it did not, to promptly submit a written counteroffer.

16. Arcadyan did not acknowledge Malikie's offer or provide a counteroffer.

17. Immediately following execution of the NDA, on July 25, 2025, Malikie requested that the parties meet to discuss a plan for moving the discussions forward. The parties met by video conference on August 19, 2025, but no agreement was reached.

18. Malikie followed up by e-mail on August 21, 2025 with a copy of the presentation that was discussed during the video conference. The e-mail also included a spreadsheet of Malikie's Wi-Fi patents, organized by family. Malikie reminded Arcadyan of the offer it made previously, and stated that while it was willing to discuss Arcadyan's feedback and alternatives for a license settlement, if Arcadyan did not respond to the FRAND license offer, Malikie was not obligated to keep the offer on the table.

19. Arcadyan replied on or about September 10, 2025 with questions about Malikie's portfolio but did not acknowledge Malikie's FRAND offer or propose a different rate.

20. Malikie provided substantive responses to Arcadyan's questions on September 18, 2025 and stated that it was available to another call to discuss next steps.

21. Between September 18, 2025 and approximately December 18, 2025, the parties exchanged correspondences, which included Malikie's specific identification of the '934 and '260

Patents on October 7, 2025 and reminders about Arcadyan's continued failure to acknowledge Malikie's FRAND offer or provide any counteroffer rate that it believed to be FRAND..

22. Malikie and Arcadyan met for a second time via a virtual meeting on January 15, 2026, during which Malikie presented further information. Malikie provided Arcadyan with a copy of the presentation shortly after the call.

23. The parties held a virtual meeting on March 19, 2026. Between March 19, 2026 and April 13, 2026, the parties continued to exchange correspondences, but Arcadyan never substantively responded to Malikie's offer for a FRAND license and never provided a counterproposal.

24. On April 15, 2026, Malikie stated in an e-mail to Arcadyan that it was Malikie's understanding that Arcadyan has rejected Malikie's FRAND proposal and asked Arcadyan to correct that understanding if it disagreed. Hearing nothing back as of June 11, 2026, Malikie reached out again. Arcadyan responded on June 23, 2026 but did not state any disagreement with Malikie's understanding that Arcadyan had rejected Malikie's FRAND offer. Arcadyan still did not provide any counteroffer rate that it believed to be FRAND.

25. The parties continued to correspond over the following months. On August 30, 2026, Malikie again requested that Arcadyan clearly identify its own proposed FRAND rate for Malikie's SEP portfolios, including the Wi-Fi portfolio. Arcadyan replied on September 16, 2026, without doing so.

26. Despite Malikie's years-long efforts to reach licensing terms with Arcadyan, Arcadyan has not consented to a license. And despite having been offered a rate at which to license Malikie's SEPs, Arcadyan has not accepted the rate, and has never proposed an alternate rate.

Malikie has therefore been left with no choice but to bring this action to enforce its rights as the owner of valid and valuable patents that Arcadyan is willfully infringing.

**IEEE 802.11 STANDARDS AND PLAINTIFF'S FRAND OBLIGATIONS**

27. The Institute of Electrical and Electronics Engineers ("IEEE") is a professional association that, among other activities, develops and publishes technical standards across a wide range of fields, including telecommunications and wireless communications.

28. The IEEE-Standards Association ("IEEE-SA") is the standards development organization within the IEEE responsible for developing and maintaining consensus-based standards in various industries, including the IEEE 802.11 family of wireless networking standards (commonly known as "Wi-Fi"). The IEEE 802.11 standards define specifications for the medium access control ("MAC") and physical ("PHY") layers to enable interoperable wireless local area network implementations. The IEEE-SA requires participants in its standards development process to comply with its patent policy, which governs the disclosure and licensing of patent rights that may be essential to the implementation of an IEEE standard. Participants are required to disclose the existence of patents or pending patent applications that they believe may contain claims essential or potentially essential to a proposed or approved standard. When such disclosure is made, the patent holder is requested to submit a Letter of Assurance ("LOA") stating whether it is willing to grant licenses to implementers of the relevant standard under terms that are fair, reasonable, and non-discriminatory ("FRAND"), consistent with the IEEE-SA patent policy.

29. BlackBerry participated actively in the IEEE standards development process, including the development of numerous standards within the 802.11 family. On multiple occasions, BlackBerry submitted public LOAs to the IEEE-SA stating that it may own patents containing Essential Patent Claims with respect to certain IEEE 802.11 standards, including the

IEEE 802.11-2012, 802.11k, 802.11mb, 802.11n, 802.11p, 802.11r, 802.11s, 802.11u, 802.11v, 802.11w, 802.11y, 802.11z, 802.11aa, 802.11ad, and 802.11ae standards. In those LOAs, BlackBerry further indicated that it was willing to grant licenses under any patents containing Essential Patent Claims on terms that are FRAND.

30. The IEEE Patent Policy and FRAND framework make clear that FRAND negotiations require a reciprocal duty of the SEP holder (Submitter) and licensee (Applicant) to engage in good faith negotiations without unreasonable delay, or alternatively, litigate. Section 6.2 of the current IEEE bylaws states:

> The Submitter and the Applicant should engage in good faith negotiations (if sought by either party) without unreasonable delay or may litigate … over patent validity, enforceability, essentiality, or infringement; Reasonable Rates or other licensing terms and conditions; compensation for unpaid past royalties or a future royalty rate… § 6.2.

31. Malikie has notified Arcadyan of infringement of its SEPs, including since at least January 10, 2025. Particularly, Malikie notified Arcadyan of its infringement of the ’646 and ’856 Patents on January 10, 2025 and the ’934 and ’260 Patents on October 6, 2025. On or about July 2, 2025, Malikie offered a specific FRAND royalty rate for all patents essential to the IEEE 802.11. As detailed above, Malikie has shared evidence of Arcadyan’s infringement of certain SEPs and has engaged in substantive licensing discussions with Arcadyan since January 10, 2025. Arcadyan has not accepted Malikie’s proposed rate or counteroffered with a rate that it believes is FRAND.

## JURISDICTION AND VENUE

32. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of their Complaint.

33. This civil action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including without limitation 35 U.S.C. §§ 271, 281, 283, 284, and 285. Thus, this is a patent infringement lawsuit over which this Court has subject matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331, 1332, and 1338(a).

34. This District has general and specific personal jurisdiction over Defendant because, directly or through intermediaries, Defendant has committed acts within this District giving rise to this action; transacts and conducts business, directly, and/or indirectly, in this District and the State of Texas; and transacts and conducts business with residents of this District and the State of Texas.

35. Defendant has infringed the Asserted Patents and, with respect to the '934 Patent, the '260 Patent, and the '856 Patent, continues to infringe within this District and the State of Texas by making, using, selling, licensing, offering for sale, and/or importing in or into this District and elsewhere in the State of Texas, products and services covered by claims in the Asserted Patents, including without limitation products that, when made or used, practice claims of the Asserted Patents. Defendant, directly and through intermediaries, makes, uses, sells, licenses, offers for sale, imports, ships, distributes, advertises, promotes, and/or otherwise commercializes such infringing products and services in or into this District and the State of Texas. Defendant regularly conducts and solicits business in, engages in other persistent courses of conducts in, and/or derives substantial revenue from goods and services provided to residents of this District and the State of Texas.

36. Defendant is doing business, either directly or through respective agents, on an ongoing basis in this Judicial District and elsewhere in the United States, and has committed acts of infringement in this district.

37. On information and belief, Defendant makes, uses, sells, offers to sells, and/or imports infringing products into and/or within this District, maintains a permanent and/or continuing presence within this District, and has the requisite minimum contacts with this District such that this venue is a fair and reasonable one. Upon information and belief, Defendant has transacted and, at the time of the filing of the Complaint, is continuing to transact business within this District.

38. Defendant purposefully directs or controls the sale of the accused products online and in nationwide retailers and wholesalers, including for sale in Texas and elsewhere in the United States, and expects and intends that the accused products will be so sold in this District. Defendant purposefully places the accused products—whether by itself or through subsidiaries, affiliates, or third parties—into an international supply chain, knowing that the accused products will be sold in the United States, including Texas and in this District. Therefore, Defendant also facilitates the sale of the accused products in Texas.

39. In particular, Defendant took and continues to take active steps, directly and/or through contractual relationships with others, with the specific intent to cause such persons to import, sell, or offer to sell the accused products in a manner that infringes the Asserted Patents. Such steps by Defendant include, among other things, making or selling the accused products outside of the United States for importation into and/or sale in the United States, or knowing that such importation or sale would occur; and directing, facilitating, or influencing their affiliates, or third-party manufacturers, shippers, distributors, retailers, or other persons acting on its or its affiliates' behalf, to import, sell, and/or offer to sell the accused products in an infringing manner.

40. Defendant utilizes established distribution channels to distribute, market, offer for sale, sell, service, and warrant infringing products directly to consumers and other users in the U.S.

Such a presence furthers the development, design, manufacture, importation, distribution, sale, and use (including by inducement) of infringing products in Texas, including in this District. For example, Defendant designs and manufactures routers and gateways provided by T-Mobile to its Internet customers in Marshall, TX: https://www.t-mobile.com/support/home-internet/5g-gateway-g5 (last visited September 1, 2026); *see also* https://broadbandnow.com/Texas/Marshall (listing T-Mobile as an Internet Provider in Marshall, Texas) (last visited September 1, 2026). As another example, Defendant designs and manufactures routers and gateways provided by Verizon to its Internet customers in Marshall, TX: https://www.verizon.com/support/verizon-internet-gateway-arc-xci55ax/; https://www.verizon.com/content/dam/verizon/support/consumer/documents/internet/verizon-cr1000b-router-guide.pdf (last visited September 1, 2026); *see also* https://broadbandnow.com/Texas/Marshall (listing Verizon as an Internet Provider in Marshall, Texas) (last visited September 1, 2026). Plaintiffs' causes of action arise, at least in part, from Defendant's contacts with and activities in and/or directed to this District and the State of Texas.

41. This Court has personal jurisdiction over Defendant pursuant to TEX. CIV. PRAC. & REM. CODE § 17.041 et seq., the Texas Long Arm Statute.

42. Venue is proper in this judicial District under 28 U.S.C. §§ 1391(b)-(c) because, among other things, Arcadyan is a foreign corporation defendant not resident in the United States and thus may be sued in any judicial district pursuant to 28 U.S.C. § 1391(c)(3); *In re HTC Corp.*, 889 F.3d 1349 (Fed. Cir. 2018).

43. Arcadyan is doing business, either directly or through respective agents, subsidiaries, or intermediaries, on an ongoing basis in this judicial District and elsewhere in the United States and have committed acts of infringement in this District.

44. Arcadyan is subject to this Court's jurisdiction pursuant to due process and the Texas Long Arm Statute due at least to its substantial business activities in this State and District, including (a) its past and present infringing activities, (b) regularly doing or soliciting business in Texas, and/or (c) engaging in persistent conduct and/or deriving substantial revenue from goods or services, including hardware, software, or support related goods or services, provided to customers in Texas.

**FIRST CLAIM**

**(Infringement of the '646 Patent)**

45. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of their Complaint.

46. The '646 Patent is generally directed to constructing a low-density parity-check (LDPC) code using a structured parity check matrix and expanding the base parity check matrix into an expanded parity check matrix.

47. The '646 Patent provides improvements to an existing technological process (e.g., encoding and decoding LDPC data) and improvements to the performance of a computer system itself (e.g., a wireless communication system). For example, the specification identifies problems in conventional systems that were "faced by the designer of LDPC codes" including "the parity part of the base parity check matrix does not allow simple encoding algorithm. Another problem is that row weight is not uniform or not close to uniform. Therefore, there is an unmet need for LDPC codes for use in modern communication systems." Exhibit 1 ('646 Patent) at 2:21-26. The '646 Patent addressed these problems through improvements in providing expanded parity check matrices to be applied to encoded data to decode LDPC data and further, to be applied to data to generate encoded data. The expanded parity check matrix is expanded "by replacing each non-

zero element by a shifted identity matrix; and replacing each zero element of the plurality of elements by a zero matrix." *Id*. at 2:40-45.

48. The '646 Patent provides numerous technical advantages. For example, the '646 Patent accommodates "larger code rates without redesigning parity check matrix and therefore avoiding changing significantly base hardware wiring, expansion of a base parity check matrix is one of the common approaches. This may be achieved, for example, by replacing each non-zero element by a permutation matrix of the size of the expansion factor." *Id*. at 2:13-20. The '646 Patent further provides "[e]fficient decoder architectures … by designing the parity check matrix, which in turn defines the LDPC code, around some structural assumptions: structured LDPC codes … LDPC parity check matrix design also results in the reduction in encoder complexity." *Id*. at 9:22-25, 41-42.

49. Defendant has been on notice of the '646 Patent and a specific factual basis for its infringement of the '646 Patent since at least January 10, 2025.

50. Defendant has, under 35 U.S.C. § 271(a), directly infringed, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '646 Patent, by having made, used, tested, sold, offered for sale, and/or imported hardware and/or software including devices compliant with IEEE 802.11 standards (excluding any products licensed under the '646 Patent), such as any of Defendant's product implementing LDPC, such as Arcadyan CR1000b, 5G gateway G5AR, Wi-Fi extender FZET06204000J, Wi-Fi extender FZET08214000J, and 5G gateway KVD21 as identified in Exhibit 5. An exemplary claim chart showing one way in which Defendant infringed claim 1 of the '646 Patent is attached as Exhibit 5.

51. Defendant has also indirectly infringed the ’646 Patent under 35 U.S.C. § 271(b) and (c).

52. Defendant has knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claim 1 of the ’646 Patent by, for example, having sold and offered access to devices compliant with IEEE 802.11 standards. Defendant knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claim 1 of the ’646 Patent by, for example, having sold, offered for sale, and encouraged customers to use at least some or all of the infringing products. Defendant, for example, provided instructions on how to access and use the infringing Wi-Fi features (including directly and/or through its resellers, wholesalers, and/or or customers). *See, e.g.*, https://www.t-mobile.com/support/home-internet/5g-gateway-g5; *see also* Exhibit 5.

53. Defendant also contributed to the direct infringement of at least claim 1 of the ’646 Patent under 35 U.S.C. § 271(c) by, for example, having supplied, with knowledge of the ’646 Patent, a material part of a claimed invention, where the material part was not a staple article of commerce and was incapable of substantial noninfringing use. For example, Defendant provided, owned, operated, sold, offered to sell, and/or imported devices compliant with IEEE 802.11 standards (such as that shown in Exhibit 5) that were not a staple article of commerce and were incapable of substantial non-infringing use.

54. Defendant’s infringement has been willful in view of the above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

**SECOND CLAIM**

**(Infringement of the ’856 Patent)**

55. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of their Complaint.

56. The ’856 Patent is generally directed to “unified and flexible signaling method and radio interface accommodate different multiple access schemes.” Exhibit 2 (’856 Patent) at Abstract.

57. The ’856 Patent includes improvements to an existing technological process (e.g., multiple access schemes) and improvements to the performance of a computer system itself (e.g., a wireless communication system). For example, the specification indicates that in conventional systems, given the “wide range of application and deployment scenarios expected in 4G with bandwidth requirements exceeding of 100 MHz, it is unlikely that a single multiple access technique with fixed bandwidth can well serve all scenarios. Past experience also suggests that lengthy standardization processes eventually lead to a compromise that accommodates multiple solutions. Therefore, it is important to design an air interface in which a mixture of multiple access schemes can be accommodated within an entire wideband channel. Although the ITU’s IMT-2000 standard encompasses three different “modes”, namely, UMTS FDD, UMTS TDD and CDMA 2000, they are effectively three distinct multiple access approaches that are very difficult to integrate. Nor does the IMT-2000 standard permit combining frequency domain approaches such as OFDM and OFCDM with time domain/code domain schemes like DS-CDMA.” *Id*. at 1:60-2:8. The ’856 Patent addresses these issues by providing “a unified and flexible signaling method and radio interface that accommodates different multiple access schemes.” *Id*. at 2:9-11. The ’856 Patent provides numerous technical advantages. For example, the ’856 Patent states “[w]hen operated adaptively with suitable control signaling, the overall communication network

performance and robustness can be greatly improved by dynamically selecting the most suitable multiple access schemes according to factors such as channel condition, equipment preference, and service requirements, etc." *Id*. at 10:62-67.

58. Defendant has been on notice of the '856 Patent and a specific factual basis for its infringement of the '856 Patent since at least January 10, 2025.

59. Defendant has, under 35 U.S.C. § 271(a), directly infringed, and continues to do so, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claims 1 and 14 of the '856 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software including devices compliant with IEEE 802.11 standards (excluding any products licensed under the '856 Patent), such as any of Defendant's products implementing multiple access schemes, such as Arcadyan 5G gateway G5AR, Arcadyan 5G gateway G4AR, and 5G gateway KVD21, as identified in Exhibit 6. An exemplary claim chart showing one way in which Defendant infringes claims 1 and 14 of the '856 Patent is attached as Exhibit 6.

60. Defendant has also indirectly infringed, and continues to indirectly infringe, the '856 Patent under 35 U.S.C. § 271(b) and (c).

61. Defendant has knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claims 1 and 14 of the '856 Patent, and continue to do so, by, for example, selling and offering access to devices compliant with IEEE 802.11 standards. Defendant knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claims 1 and 14 of the '856 Patent, and continues to do so, by, for example, selling, offering for sale, and encouraging customers to use at least some or all of the infringing products. Defendant, for example, provides instructions on how to access and use the infringing Wi-Fi features

(including directly and/or through its resellers, wholesalers, and/or or customers). *See, e.g.*, https://www.t-mobile.com/support/home-internet/t-mobile-gateway; *see also* Exhibit 6.

62. Defendant also contributed to the direct infringement, and continues to do so, of at least claims 1 and 14 of the '856 Patent under 35 U.S.C. § 271(c), and continues to do so, by, for example, supplying, with knowledge of the '856 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Defendant provides, owns, operates, sells, offers to sell, and/or imports devices compliant with IEEE 802.11 standards (such as that shown in Exhibit 6) that are not a staple article of commerce and are incapable of substantial non-infringing use.

63. Defendant's ongoing infringement is willful in view of the above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

**THIRD CLAIM**
**(Infringement of the '934 Patent)**

64. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of their Complaint.

65. The '934 Patent is generally directed to selecting a low-density parity-check (LDPC) code used for encoding variable sized data. The claims of the '934 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

66. The '934 Patent includes improvements to an existing technological process (e.g., selecting an LDPC code) and improvements to the performance of a computer system itself (e.g., a wireless communication system). For example, the specification discloses: "[o]ne problem when using LDPC codes is a necessity to properly adjust the encoding procedure due to variable payload size and due to variable underlying transmission mechanism. Such encoding procedure typically

assumes usage of shortening and puncturing techniques. Furthermore, there may be a plurality of LDPC codes with different codeword lengths and code rates available. The number of the possible combinations may present a challenge to select the appropriate LDPC code to provide a suitable coding gain, and at the same time minimize the number of encoded packets, codewords and modulated symbols." Exhibit 3 ('934 Patent) at 1:66-2:9. The '934 Patent addressed these problems through improvements in selecting an LDPC code for variable sized data as disclosed in at least claim 1: "[a] method for selecting a low-density parity-check (LDPC) code used for encoding variable sized data…. encoding data using the selected LDPC code."

67. The patent teaches another example of an improvement in selecting an LDPC code for variable sized data: "these [known] methods do not directly address the problem described earlier: apply shortening and puncturing in such a way that the code rate is approximately the same as the original one, and the coding gain is preserved. One method attempting to solve this problem specifies shortening and puncturing such that the code rate of the original code is preserved." *Id.* at 7:17-23. The specification discloses how the ordered combination of calculating a number of shortening bits and a number of puncturing bits when selecting an LDPC code provides a significant improvement to the performance of the wireless communication system at the time of the invention. For example, the specification discloses the advantages of shortening "[i]n the case of a column regular parity check matrix, or more generally, approximately regular or regular and approximately regular only in the data part of the matrix, H, the method described in the previous paragraph is still preferred compared to the existing random or periodic/random approach. The method described here ensures approximately constant row weight, which is another advantage from the performance and the implementation complexity standpoint." *Id.* at 9:57-59. Improvements in selecting an LDPC code using shortening are disclosed in at least claim 1:

"calculating a number of shortening $N_{shortened}$ bits for each of the plurality of LDPC codes; … determining, in a computer processor, a selected LDPC code from the plurality of shortened LDPC codes," dependent claim 3: "herein the performance criterion is selected from the group consisting of … a range of $N_{shortened}$," dependent claim 4: "wherein the performance criterion is selected from the group consisting of… a maximum for $N_{shortened}$."

68. Another example of the advantages of the ordered combination of calculating a number of shortening bits and a number of puncturing bits when selecting an LDPC code is disclosed in *Id*. at 10:61-11:1, with reference to the performance curves of Fig. 9: "[a]mong all of those [performance curves], it appears that for the particular matrix structure (irregular $H_d$ part with the modified dual diagonal in the $H_p$ part) the best results are obtained when both criteria [shortened bits and punctured bits] are taken into account, as represented by curves 242, 243, 245, 246. Among all of those, it appears that for the particular matrix structure (irregular $H_d$ part with the modified dual diagonal in the $H_p$ part) the best results were obtained when the punctured bits were selected from those corresponding to the weak columns of the data part of the parity check matrix, $H_d$." Improvements in selecting an LDPC code using puncturing are disclosed in at least claim 1: "calculating a number of puncturing $N_{punctured}$ bits for each of the plurality of LDPC codes; … determining, in a computer processor, a selected LDPC code from the plurality of shortened LDPC codes and the plurality of punctured LDPC codes meeting the performance criterion," dependent claim 3: "wherein the performance criterion is selected from the group consisting of … a range of $N_{punctured}$," dependent claim 4: "wherein the performance criterion is selected from the group consisting of… a minimum for $N_{punctured}$,"

69. Another example of the advantages of the ordered combination of calculating a number of shortening bits and a number of puncturing bits when selecting an LDPC code is based

on a ratio of shortening to puncturing bits. For example, "the shortening-to-puncturing ratio can be chosen such that it guarantees preservation of the performance level of the original code." *Id.* at 11:11-13. Further, the specification discloses that a normalized shortening to puncturing ratio, $q_{normalized}$ can be used to reduce complexity and preserve performance "if the goal is to preserve performance, this normalized ratio must be greater than one: $q_{normalized}>1$. It was found through much experimentation that $q_{normalized}$ in the range of 1.2-1.5 complies with the performance preserving requirements." *Id.* at 11:19-23. Improvements in selecting an LDPC code based on a shortening-to-puncturing ratio are disclosed in at least claim 1: "determining, in a computer processor, a selected LDPC code from the plurality of shortened LDPC codes and the plurality of punctured LDPC codes meeting the performance criterion," dependent claim 3: "wherein the performance criterion is selected from the group consisting of…. a range for normalized shortening to puncturing ratio, $q_{normalized}$," and dependent claim 4: "wherein the performance criterion is selected from the group consisting of… a maximum for normalized shortening to puncturing ratio, $q_{normalized}$."

70. Another example of the significant improvement to LDPC coding methods claimed by the invention is the use of an ordered combination of claim elements to meet a performance criteria "[t]he LDPC codes with different lengths and code rates generally result in a plurality of possible coding options, from which a coding option may be chosen based on the criteria as described above, namely: (a) Keep the performance i.e. the coding gain as high as possible; (b) Use as few modulated symbols as possible; and (c) Keep the overall complexity at a reasonable level." *Id.* at 12:26-34. Criteria (a) "the coding gain as high as possible" results in the improvement of reducing the bit error rate in the wireless communication thereby increasing its efficiency and performance. Criteria (b) results in an improvement in reduced transmit power and increased

bandwidth (more bits per second). Criteria (c) results in reduced CPU cycles thereby reducing network latency and increasing battery life. The selection of the performance criteria is based on one or more parameters as recited in claim 3: "wherein the performance criterion is selected from the group consisting of a range of effective coding rates, a range of basic coding rates, a range of numbers of transmission symbols, a range of $N_{punctured}$, a range of $N_{shortened}$, a range of parity bits in LDPC codewords, a range for normalized shortening to puncturing ratio, $q_{normalized}$, and a combination thereof," and claim 4: "wherein the performance criterion is selected from the group consisting of a minimum effective coding rate, a minimum basic coding rate, a minimum number of transmission symbols, a minimum for $N_{punctured}$, a maximum for $N_{shortened}$, a maximum number of parity bits in LDPC codewords, a maximum for normalized shortening to puncturing ratio, $q_{normalized}$, and a combination thereof."

71. Defendant has been on notice of the ’934 Patent and a specific factual basis for its infringement of the ’934 Patent since at least October 7, 2025.

72. Defendant has, under 35 U.S.C. § 271(a), directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claims 1 and 10 of the ’934 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software including devices compliant with IEEE 802.11 standards (excluding any products licensed under the ’934 Patent), such as any of Defendant’s product implementing LDPC, such as Arcadyan CR1000b, 5G gateway G5AR, Wi-Fi extender FZET06204000J, Wi-Fi extender FZET08214000J, and 5G gateway KVD21 as identified in Exhibit 7. An exemplary claim chart showing one way in which Defendant infringes claims 1 and 10 of the ’934 Patent is attached as Exhibit 7.

73. Defendant has also indirectly infringed, and continues to indirectly infringe, the ’934 Patent under 35 U.S.C. § 271(b) and (c).

74. Defendant has knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claims 1 and 10 of the ’934 Patent, and continues to do so, by, for example, selling and offering access to devices compliant with IEEE 802.11 standards. Defendant knowingly, intentionally, and actively aid, abet, and induce others to directly infringe at least claims 1 and 10 of the ’934 Patent by, for example, selling, offering for sale, and encouraging customers to use at least some or all of the infringing products. Defendant for example, provides instructions on how to access and use the infringing Wi-Fi features (including directly and/or through its resellers, wholesalers, and/or or customers). *See, e.g.*, https://www.t-mobile.com/support/home-internet/5g-gateway-g5; *see also* Exhibit 7.

75. Defendant also contributed to the direct infringement of at least claim 1 of the ’934 Patent under 35 U.S.C. § 271(c), and continues to do so, by, for example, supplying, with knowledge of the ’934 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Defendant provides, owns, operates, sells, offers to sell, and/or imports devices compliant with IEEE 802.11 standards (such as that shown in Exhibit 7) that are not a staple article of commerce and are incapable of substantial non-infringing use.

76. Defendant’s ongoing infringement is willful in view of the above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

**<u>FOURTH CLAIM</u>**

**(Infringement of the '260 Patent)**

77. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of their Complaint.

78. The '260 Patent is generally directed to registering a wireless device with access points in wireless network environments.

79. The '260 Patent includes improvements to an existing technological process (e.g., registering with access points in wireless networks) and improvements to the performance of a computer system (e.g., a wireless communication system). For example, conventionally, "[t]he experience associated with these techniques or standards for registering a wireless device to a local network or external network via an access point … can be quite frustrating to a user" because it involved "user involvement typically through the use of a user interface to register a wireless device with an external network" prior to visiting the network or when the wireless device comes within communication range of the network. Exhibit 4 ('260 Patent) at 1:46-51. The '260 Patent addresses these issues by "transmitting/receiving a trigger message to/from a second device based on wireless short-range communication. The trigger message initiates a registration process within a wireless local area network (WLAN)." *Id*. at Abstract.

80. Furthermore, the '260 Patent solved the problem associated with requiring manual "input registration information such as credentials, wireless device information, personal information (e.g., name and postal address), payment information (e.g., credit card number, account number, pre-paid account number, coupon number, etc.), terms and conditions acceptance, etc. using a user-input interface or display on the wireless device." *Id*. at 2:58-2:65. For example, the '260 Patent teaches the wireless device can "'trigger' (i.e., initiate or prompt) the automatic registration of a wireless device with an external network through a WLAN hotspot without

requiring a user of the wireless device to manually input or provide registration information via the wireless device." *Id*. at 3:12- 3:16. Further, claim 12 states "wherein the first message automatically initiates a registration process with an access point (AP) of a wireless local area network (WLAN) associated with the first wireless device." *Id*. at 18:17-20.

81. Defendant has been on notice of the '260 Patent and a specific factual basis for its infringement of the '260 Patent since at least October 7, 2025.

82. Defendant has, under 35 U.S.C. § 271(a), directly infringed, and continue to do so, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 12 of the '260 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software including devices compliant with IEEE 802.11 standards (excluding any products licensed under the '260 Patent), such as any of Defendant's product implementing registering for external networks, such as 5G gateway G5AR and WE8214443 T-Mobile mesh Wi-Fi extender (V2) as identified in Exhibit 8. An exemplary claim chart showing one way in which Defendant infringes clam 12 of the '260 Patent is attached as Exhibit 8.

83. Defendant has also indirectly infringed, and continues to indirectly infringe, the '260 Patent under 35 U.S.C. § 271(b) and (c).

84. Defendant has knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claim 12 of the '260 Patent, and continues to do so, by, for example, selling and offering access to devices compliant with IEEE 802.11 standards. Defendant knowingly, intentionally, and actively aid, abet, and induce others to directly infringe at least claim 12 of the '260 Patent, and continues to do so, by, for example, selling, offering for sale, and encouraging customers to use at least some or all of the infringing products. Defendant for example, provides instructions on how to access and use the infringing Wi-Fi features (including

directly and/or through its resellers, wholesalers, and/or or customers). *See, e.g.*, https://www.t-mobile.com/support/home-internet/5g-gateway-g5; *see also* Exhibit 8.

85. Defendant also contributed to the direct infringement of at least claim 12 of the ’260 Patent under 35 U.S.C. § 271(c), and continues to do so, by, for example, supplying, with knowledge of the ’260 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Defendant provides, owns, operates, sells, offers to sell, and/or imports devices compliant with IEEE 802.11 standards (such as that shown in Exhibit 8) that are not a staple article of commerce and are incapable of substantial non-infringing use.

86. Defendant’s infringement has been willful in view of the above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

## PRAYER FOR RELIEF

WHEREFORE, Malikie and KPI pray for judgment against Arcadyan as follows:

A. That Arcadyan has infringed each of the Asserted Patents and will continue to infringe the ’856, ’934 and ’260 Patents unless enjoined;

B. That Arcadyan’s infringement of the Asserted Patents has been willful;

C. That Arcadyan pay Malikie and KPI damages adequate to compensate for its past infringement of each of the Asserted Patents, and present and future infringement of the ’856, ’934 and ’260 Patents, together with interest and costs under 35 U.S.C. § 284;

D. That Arcadyan pay prejudgment and post-judgment interest on the damages assessed;

E. That Arcadyan pay Malikie and KPI enhanced damages pursuant to 35 U.S.C. § 284;

F. That Arcadyan be ordered to pay ongoing royalties to Malikie and KPI for any post-judgment infringement of the ’934 and ’260 Patents;

G. That this is an exceptional case under 35 U.S.C. § 285; and that Arcadyan pay Malikie and KPI’s attorneys’ fees and costs in this action; and

H. That Malikie and KPI be awarded such other and further relief, including equitable relief, as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Malikie and KPI hereby demands a trial by jury on all issues triable to a jury.

Dated: September 30, 2026

Respectfully submitted,

*/s/Patrick Colsher by permission Claire Abernathy Henry*

Patrick Colsher – LEAD ATTORNEY
Khue Hoang
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
650 Fifth Avenue, Suite 2320
New York, NY 10019
Tel: (212) 381-1965
pcolsher@reichmanjorgensen.com
khoang@reichmanjorgensen.com

Naveed Hasan
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
Tel: (202) 894-7310
nhasan@reichmanjorgensen.com

*Of Counsel:*

Claire Abernathy Henry
Texas State Bar No. 24053063
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, TX 75604
Tel: (903) 757-6400
claire@millerfairhenry.com

Matthew G. Berkowitz
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel: (650) 623-1401
mberkowitz@reichmanjorgensen.com

*Attorneys for Plaintiffs*
*Malikie Innovations Ltd. and*
*Key Patent Innovations Ltd.*